[No. H035504. Sixth Dist. Feb. 15, 2011.]

In re CESAR V., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CESAR V., Defendant and Appellant.

[No. H035591. Sixth Dist. Feb. 15, 2011.]

In re ANTONIO V., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ANTONIO V., Defendant and Appellant.

990

COUNSEL

Eileen Mary Rice, under appointment by the Court of Appeal, for Defendant and Appellant Cesar V.

Jill A. Fordyce, under appointment by the Court of Appeal, for Defendant and Appellant Antonio V.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MIHARA, J.—Appellants Cesar V. and Antonio V. challenge the juvenile court's findings that they violated Penal Code section 415, subdivision (1) by making a challenge to fight in a public place, and its findings that these offenses were committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (d)). They contend that neither the substantive violations nor the gang allegations are supported by substantial evidence. Cesar and Antonio also assert, and the Attorney General concedes, that a remand is required because the juvenile court neglected to declare whether the offenses are misdemeanors or felonies. We hold that a violation of Penal Code section 415, subdivision (1) is not a specific intent offense. We find that substantial evidence supports the juvenile court's findings, but we remand for declarations of the felony or misdemeanor status of each of the offenses.

## I. Evidence Presented at the Jurisdictional Hearing

The only witnesses at the contested jurisdictional hearing were Santa Cruz Police Sergeant Loran Baker and the prosecution's gang expert.

Baker testified that on November 19, 2009, at 12:30 p.m., he was driving east on Laurel Street just past Center Street near downtown Santa Cruz. He

was in plain clothes and driving an unmarked car. The traffic was "stop-and-go," so he was proceeding at just "a few miles per hour." Baker saw 16-year-old Cesar and 17-year-old Antonio walking westbound along the sidewalk on the other side of Laurel Street. Cesar and Antonio had "their attention directed towards the traffic and [were] making some hand signs." Baker was particularly attentive to this activity because a 16-year-old boy had been stabbed to death "where the same kind of exchange was occurring" just a month earlier, a block away from this location.

Baker "couldn't tell if" the hand signs being made by Cesar and Antonio were directed at "a car or somebody on the [other side of the] street," but he saw that "their gestures . . . seemed to be getting more aggressive and [they were] moving towards them like they were challenging them to fight, I realized then, hey, this is for real, and they are challenging somebody." Since their behavior was "aggressive," Baker could tell that they were not "fooling around." Cesar and Antonio "changed directions" and "were moving towards the street." Cesar and Antonio put their hands up in the air while taking "a few steps towards the cars like, hey, let's go," a gesture that Baker "took that as a challenge, let's go." They "held their arms up in an inviting manner" which was "like, hey, it's on, you're open to somebody approaching you."

Because Cesar and Antonio had moved to the edge of the sidewalk, and Baker was concerned that violence would ensue, he "did a U-turn in traffic," drove up behind Cesar and Antonio, activated his lights, called for backup, and told Cesar and Antonio to "wait right there." When a uniformed officer arrived to assist Baker less than two minutes later, Baker and the other officer separated Cesar and Antonio and spoke with them individually.[1]

Antonio told Baker that he had "been using hand signals to display a gang slogan . . . towards a car." Antonio described the car as a white Cadillac and "wanted to know why I wasn't stopping it . . . ." He told Baker that "one of the occupants in the rear seat [of the Cadillac] had actually thrown him a four, meaning Norteno sign" which would identify that person as a Norteno gang member. Antonio told Baker that he had made signs for P, S, and C to signify the Poor Side Chicos gang, a Watsonville Sureno gang.[2] Antonio asserted that he "took it [the occupant's alleged sign] as being a challenge, a form of disrespect." He said he was "not really afraid because . . . there was a

---

[1] This event occurred very close to the police station, which is on Center Street.

[2] Poor Side Chicos consists of the "younger members" of the Poor Side gang, who are between 14 and 26 years old. Poor Side Chicos uses PSC to identify itself, and this may be expressed in hand signs. Like other Sureno gangs, Poor Side Chicos associates with the color blue and the number 13. The primary activities of the Poor Side gang are selling narcotics and committing assaults, usually by stabbing or shooting. Poor Side gang members "hate" Nortenos and "really don't get along with anybody." Poor Side gang members often initiate a confrontation nonverbally: "they never say a word."

girl in the car." Antonio told Baker that he thought a fight was unlikely to occur because "typically there won't be a gang fight when the girl was present." Antonio also said that any fight would have been "fair" because there were two people in the Cadillac. Antonio denied being a gang member, but he admitted that he associated with Poor Side Chicos gang members. He said that he "had to . . . kind of like stand up for his friends." Antonio acknowledged that he was aware that his conduct had occurred in an area "where Nortenos and Surenos would actually cross paths and it would be not good." Antonio also admitted that the blue "swoosh" on the Nike shoes he was wearing was intended to "signify" his Sureno affiliation.

Baker then spoke to Cesar. Like Antonio, Cesar admitted making a "hand gesture" of "a P an S and a C for Poor Side Chicos" and claimed that an occupant of a white Cadillac had made a gesture. Cesar maintained that he "was just holding his ground and not trying to challenge the occupants" of the Cadillac. Cesar said he was not a gang member but admitted he associated with members of the Poor Side Chicos gang.

Cesar and Antonio had been stopped previously by police in the company of a Poor Side Chicos gang member. On another occasion, they were stopped by police with Sureno gang members, and Antonio was wearing attire associated with the Poor Side Chicos gang.

Baker testified that he was not "operating under any assumption" as to whether there actually was a white Cadillac with an occupant who made a gang gesture. He thought it was "a possibility" that Cesar and Antonio were responding to such a gesture, but he did not think it mattered.

The prosecution's gang expert testified that a gesture of putting one's hands up in the air would be seen as "challenging the other person." He also opined that the "common response" to someone making a gang sign is violence. The expert testified that there was "no other reason" for a person to make a gang sign besides "challenging them to fight." The presence of a girl would not eliminate the risk of violence in such a situation. The gang expert testified that the Poor Side Chicos gang would benefit from a challenge such as that made by Cesar and Antonio because "[i]t would further the violent reputation" of the gang "within the community."

## II. Procedural Background

Welfare and Institutions Code section 602 petitions were filed alleging that Cesar and Antonio had violated Penal Code section 415, subdivision (1) and that their offenses could be treated as either felonies or misdemeanors

because the offenses had been committed for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (d)).

The prosecutor argued that a gang sign "thrown at someone that is perceived as a rival, is an invitation to a fight, a challenge to a fight." Cesar's trial counsel argued that Cesar and Antonio "were in fact not challenging someone to fight. They were responding to something that turned out to be not a challenge at all." Antonio's trial counsel joined in Cesar's counsel's arguments and also argued that Antonio "didn't think a fight was going to happen, so clearly in his mind he is not challenging someone to fight."

The court found that Cesar and Antonio had violated Penal Code section 415, subdivision (1) by making gang signs in an "aggressive" manner and using a gesture to indicate "[l]et's go." It also found true the gang allegations.

Antonio, who had previously been declared a ward, was continued as a ward and placed in his parents' home on probation. Cesar was placed on probation without wardship in the custody of his parents. Cesar and Antonio timely filed notices of appeal.

## III. Discussion

### A. Sufficiency of the Evidence

### 1. Penal Code Section 415, Subdivision (1) Violations

Cesar and Antonio contend that the juvenile court's findings that they violated Penal Code section 415, subdivision (1) are not supported by substantial evidence.

"The standard of proof in juvenile proceedings involving criminal acts is the same as the standard in adult criminal trials." (*In re Jose R.* (1982) 137 Cal.App.3d 269, 275 [186 Cal.Rptr. 898].) Thus, "we must apply the same standard of review applicable to any claim by a criminal defendant challenging the sufficiency of the evidence to support a judgment of conviction on appeal. Under this standard, the critical inquiry is 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] An appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] [¶] In reviewing the evidence adduced at trial, our perspective must favor the

judgment. [Citations.] 'This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.] [¶] Before the judgment of the trial court can be set aside for insufficiency of the evidence . . . , it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. [Citation.]' [Citations.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1371–1372 [112 Cal.Rptr.2d 620] (*Ryan*).)

Penal Code section 415, subdivision (1) provides: "Any person who unlawfully fights in a public place or challenges another person in a public place to fight" commits a misdemeanor. (Pen. Code, § 415, subd. (1).) Antonio and Cesar assert that their conduct was not a "challenge[] . . . to fight" because they were merely *responding* to a gang sign displayed by an occupant of a white Cadillac. This assertion assumes that the juvenile court was required to accept the truth of their statements to Baker. Cesar claims that "the arresting officer, the district attorney and the juvenile court all treated appellant and his brother's version of the incident as true." He provides no record citations to support this claim, and our review of the record discloses no support for it.

Baker, the arresting officer, testified that he did not accept or "assum[e]" the truth of the claim that Cesar and Antonio were responding to a gesture from a white Cadillac; he simply investigated that "possibility." Neither the prosecutor nor the court ever expressed any opinion on the truth of the claim that Antonio and Cesar were responding to a gesture by an occupant of a white Cadillac. It is irrelevant that, as Cesar notes, "the juvenile court itself gave no indication that it disbelieved appellant's interpretation of the events." The juvenile court had no obligation to make an express statement identifying the evidence that it believed and the evidence it disbelieved.

Our standard of review requires us to " '*presume* in support of the judgment the existence of every fact the trier *could reasonably deduce* from the evidence' " and precludes us from reversing unless " 'upon no hypothesis whatever' " does substantial evidence support the order. (*Ryan, supra*, 92 Cal.App.4th at p. 1372, italics added.) Since the juvenile court could reasonably discredit the self-serving statements of Cesar and Antonio that they were merely *responding* to a gang sign from an occupant of a white Cadillac rather than *initiating* a challenge, we must presume that the court did so. But for the

statements of Cesar and Antonio, no evidence was presented that a white Cadillac was within sight of Cesar and Antonio when they were observed by Baker, or that any occupant of any car or any other person made a gang sign that instigated the conduct of Cesar and Antonio observed by Baker. While the evidence before the juvenile court indicated that Cesar and Antonio were probably reacting to *something* they observed, the precise nature of their observations was unknown. They may have been reacting to a person, either in a vehicle or on the other side of the street, who was wearing red or whom one or both of them recognized as a Norteno gang member. Or they may have simply been trying to intimidate someone to whom they took a dislike. As the juvenile court was not obligated to credit the statements by Cesar and Antonio to Baker that they were merely *responding* to a gang sign made by another person, the evidence did not preclude the court from finding that Cesar and Antonio were not reacting to the instigation of another but were themselves the initiators of a challenge to fight.

Cesar maintains that his conduct did not violate Penal Code section 415, subdivision (1) because he was "within his legally permissible right under the laws of self-defense to stand one's ground and respond to an attack in equal manner." He also argues that the evidence established "at most" that he "accepted another's challenge" to fight, rather than himself challenging another to fight. Cesar claims: "The occupants of the white car instigated the interaction by challenging appellant and his brother; it was only after the initial act of aggression that appellant and Antonio theoretically *accepted* the challenge . . . ." Cesar's "self-defense" claim and his contention that he merely "accepted" a challenge cannot succeed because the juvenile court was not obligated to credit the statements of Antonio and Cesar that they were responding to a gang sign made by an occupant of a white Cadillac. We must presume in support of the juvenile court's jurisdictional findings that it discredited those statements, which eliminates the factual premise for Cesar's "self-defense" and "accepted the challenge" contentions.

Antonio and Cesar claim that a violation of Penal Code section 415, subdivision (1) requires proof of a specific intent "to cause a fight," and they assert that the juvenile court's findings that they violated this statute are not supported by proof that they harbored such a specific intent.

■ To determine whether an offense requires specific intent, we "begin with an examination of the statutory language describing the proscribed conduct, including any express or implied reference to a mental state." (*People v. Hering* (1999) 20 Cal.4th 440, 445 [84 Cal.Rptr.2d 839, 976 P.2d 210].) The statutory language here applies to a "person who unlawfully . . . challenges another person in a public place to fight." (Pen. Code, § 415, subd. (1).) Penal Code section 415, subdivision (1) contains no express or

implied reference to a mental state. ■ "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370].) ■ Here, the definition of the crime is simply a description of the prohibited act, and there is no reference to an intent to do a further act or achieve a future consequence. Thus, a violation of Penal Code section 415, subdivision (1) would appear to require no more than general criminal intent.

The legislative history of this criminal prohibition confirms that no specific intent is required. "[C]hallenging to fight" was first criminalized in this state in 1850. The 1850 statute provided: "If any person, at late and unusual hours of the night time, shall maliciously and wilfully disturb the peace or quiet of any neighborhood or family by . . . *challenging to fight*, or fighting, every person convicted thereof shall be fined . . . or imprisoned . . . ." (Stats. 1850, ch. 99, § 112, p. 243, italics added.) That prohibition remained in force until 1974. In 1974, that statute was repealed, and the current version of Penal Code section 415 was enacted. The "challenges . . . to fight" language has not been altered since then.[3] The purpose of the 1974 legislative act was to respond to decisions of the United States Supreme Court invalidating portions of the previous version of Penal Code section 415. (Assem. Com. on Crim. Justice, Rep. on Sen. Bill No. 2294 (1974 Reg. Sess.) Aug. 20, 1974, p. 2.) In *Cohen v. California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780] (*Cohen*), the United States Supreme Court reversed the judgment in a case in which the defendant had been convicted under the prior version of Penal Code section 415. The ground for the reversal was that the conviction was based solely on speech protected by the First Amendment. (*Cohen*, at pp. 19, 26.) The court noted that the speech at issue (a jacket bearing the words " ' "Fuck the Draft" ' ") did not fall within any of the established exceptions to First Amendment protection, which included obscenity, "so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction," and a speaker's communications "intentionally provoking a given group to hostile reaction." (*Cohen*, at pp. 16, 20, 24.) In 1974, the United States Supreme Court, citing *Cohen*, reversed a Louisiana criminal conviction for "breach of the peace" due to First Amendment concerns. (*Lewis v. City of New Orleans* (1974) 415 U.S. 130, 132, 134 [39 L.Ed.2d 214, 94 S.Ct. 970].) The United States Supreme Court thereafter

---

[3] Penal Code section 415 has been amended a few times since 1974, but subdivision (1) has not been altered.

vacated the judgment in a second California Penal Code section 415 case and remanded that case for reconsideration in light of *Lewis*. (*Rosen v. California* (1974) 416 U.S. 924 [40 L.Ed.2d 280, 94 S.Ct. 1922].)

The Legislature responded to these decisions by repealing the old version of Penal Code section 415 and enacting a new version of Penal Code section 415. The new version was intended to "regulate pure speech (without the necessity of any other conduct) when the communication would tend to result in a violent reaction." (Legis. Counsel, Rep. on Sen. Bill No. 2294 (1974 Reg. Sess.) p. 1.) The old version of Penal Code section 415 had no subdivisions and prohibited a variety of speech and conduct in a single sentence. In contrast, the new version contained three subdivisions, each of which covered a distinct type of offense. Penal Code section 415, subdivision (1) contained no reference to any mental state whatsoever, and applied only to "fights" and "challenges . . . to fight" that occurred in a public place. Subdivision (2) explicitly required that the perpetrator act "maliciously and willfully," applied only to "disturb[ing] another person by loud and unreasonable noise," and was not limited to events that occurred in public places. Subdivision (3) did not refer to any mental state and applied to the use of "offensive words in a public place," but was restricted to words "inherently likely to provoke an immediate violent reaction."

The Legislature's use of three separate subdivisions was part of a carefully calibrated scheme designed to prohibit communications that "would tend to result in a violent reaction." Because a fight or challenge to fight in a public place *necessarily* tends to result in a violent reaction, the Legislature found no need to delimit the application of Penal Code section 415, subdivision (1). On the other hand, because "offensive words" and "loud and unreasonable noise" do not necessarily tend to result in a violent reaction, the Legislature imposed additional requirements designed to limit these prohibitions to those words and noises which "would tend to result in a violent reaction."

■ The Legislature's calibration of the mental states and other elements required under each subdivision of Penal Code section 415 was inherently reasonable. A *challenge* to fight is prohibited because such a challenge may provoke a violent response that endangers not only the challenger but any other persons who may be in the public place where the challenge occurs. Because the statute is aimed at the inherent danger that a challenge will result in violence, it is irrelevant whether the challenger intended to actually cause a fight. The mere fact that the challenger may naively believe that his challenge will go unanswered does not reduce the danger that the challenge poses to

both the challenger and the public.[4] Since the danger that a challenge to fight creates, and that the Legislature intended to prohibit, is unaffected by the challenger's subjective intent to actually cause a fight or his subjective belief that a fight will not occur or is unlikely to occur, no specific intent is required.[5] If a person challenges another person to fight in a public place, he or she violates Penal Code section 415, subdivision (1).

█ Since no specific intent was required, the alleged absence of evidence of such an intent is irrelevant. Baker's testimony was sufficient to support a finding that the gestures that Cesar and Antonio made toward someone in a car or on the other side of the street were a challenge to fight. It was undisputed that these gestures were made in a public place. Thus, substantial evidence supports the juvenile court's findings that Cesar and Antonio violated Penal Code section 415, subdivision (1).

## 2. Gang Allegations

Antonio and Cesar attack the sufficiency of the evidence to support the juvenile court's findings on the Penal Code section 186.22, subdivision (d) gang allegations that they harbored the required specific intent.[6]

"Any person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison for one, two, or three years . . . ." (Pen. Code, § 186.22, subd. (d).)

Antonio and Cesar claim that (1) the prosecution's proof was inadequate because the evidence established that they merely intended "to stand their ground" and "that they didn't intend to fight and didn't expect a fight," and (2) the prosecution failed to prove "*what criminal conduct* of the gang" they were seeking to promote.[7] (Italics added.)

---

[4] Here, for instance, Baker testified that a display of gang signs had occurred just a block away a month earlier, resulting in the death of a 16-year-old boy.

[5] This analysis also disposes of Antonio's contention that his conduct could not have been a challenge to fight because he did not believe that a fight would actually occur.

[6] The sole impact of the court's true findings on these allegations was that the court then had the discretion to declare that these offenses, which were otherwise misdemeanors, were felonies.

[7] Antonio and Cesar rely exclusively on Ninth Circuit Court of Appeals opinions to support their claims. The California Supreme Court recently rejected the Ninth Circuit's interpretation · of this specific intent requirement and agreed with the California Courts of Appeal, which have

■ The specific intent element did not depend on whether Cesar and Antonio intended to merely "stand their ground" or "to fight." Both Cesar and Antonio admitted to Baker that the purpose of their conduct was to signal their association with the Poor Side Chicos gang, and Antonio further admitted that he was motivated by his desire to "stand up for" his Poor Side Chicos gang member friends. The gang expert testified that the Poor Side Chicos gang would benefit from a challenge such as that made by Cesar and Antonio because "[i]t would further the violent reputation" of the gang "within the community." There was no reason for Cesar and Antonio to make a gang challenge except to promote further criminal activity by Poor Side Chicos gang members. The juvenile court could have drawn the reasonable inference from this evidence that Cesar and Antonio made a gang challenge that identified them with the Poor Side Chicos gang because they wanted to enhance that gang's violent reputation and thereby further future criminal conduct by their Poor Side Chicos gang member friends. Their second claim also fails. The prosecution was not required to prove "what criminal conduct" Cesar and Antonio were seeking to promote by their conduct. " 'There is no statutory requirement . . . that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.' " (*Albillar, supra,* 51 Cal.4th at p. 66.)

Substantial evidence supports the juvenile court's findings on the gang allegations.

## B. Failure to Declare That Offenses Are Felonies or Misdemeanors

Antonio and Cesar request a remand for the juvenile court to make a declaration of the felony or misdemeanor status of their offenses. "If the minor is found to have committed an offense which would in the case of an adult be punishable alternatively as a felony or a misdemeanor, *the court shall declare* the offense to be a misdemeanor or felony." (Welf. & Inst. Code, § 702, italics added.) The true findings on the gang allegations made the offenses alternatively punishable as felonies or misdemeanors, but the juvenile court failed to make the required declaration of the felony or misdemeanor status of each of the offenses. In *In re Manzy W.* (1997) 14 Cal.4th 1199 [60 Cal.Rptr.2d 889, 930 P.2d 1255], the California Supreme Court held that a remand was required where the juvenile court had failed to make an express declaration as to whether the offense was a felony or a misdemeanor. The Attorney General concedes that a remand is required, and we agree.

universally rejected the Ninth Circuit's interpretation. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 [119 Cal.Rptr.3d 415, 244 P.3d 1062] (*Albillar*); see *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353–354 [100 Cal.Rptr.3d 351]; *People v. Hill* (2006) 142 Cal.App.4th 770, 773–774 [47 Cal.Rptr.3d 875]; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [43 Cal.Rptr.3d 862].)

## IV. Disposition

The orders are reversed, and the matter is remanded to the juvenile court for the court to exercise its discretion to declare each of the offenses to be either a felony or a misdemeanor.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.

The petition of appellant Antonio V. for reveiw by the Supreme Court was denied May 18, 2011, S191558.