Filed 8/5/14  In re C.L. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re C.L., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B252133 (Super. Ct. No. 2012040348) (Ventura County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.L.,<br><br>    Defendant and Appellant. | |

Rival gangs encounter one another in the territory claimed by appellant's gang.  A fight ensues in which members of both gangs are wounded.  Appellant is seen beating a member of the opposing gang with a baseball bat.  We conclude that such evidence is the paradigm for proof that appellant's conduct was intended to promote, further, or assist in the criminal conduct of the gang.  (Pen. Code, § 186.22, subd. (b)(1).)[1]  It demonstrated, at a minimum, that appellant was defending the gang's territory.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

An amended wardship petition (Welf. & Inst. Code, § 602) charged minor C.L. with a variety of offenses.[2]  He admitted all but the charge of assault with a deadly weapon (§ 245, subd. (a)(1)), and a special allegation that he committed the assault for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)), each of which was sustained by the juvenile court.  The court placed C.L. on probation, set his maximum term of confinement at five years four months, and ordered that he serve 210 days, with credit for 123 days.  He was also ordered to pay restitution to the state fund in the amount of $200 and to the victim, Joseph Magdaleno, in an amount to be determined.

C.L. appeals, contending that the evidence was insufficient to sustain the truth of the gang allegation.[3]  He further contends that the juvenile court abused its discretion by not allowing in evidence of the opposing gang's graffiti threatening physical harm to his gang.  We affirm.

FACTS

*Prosecution Evidence*

On May 18, 2013, shortly after 4:00 p.m., Dennis Tooman was riding his bicycle along the Arroyo wash in Simi Valley.  He observed two groups of young men. The groups were facing one another, standing no more than five yards apart, on either side of a cement drain.  Most of the young men held "good size" rocks behind their backs.  One was taunting the other group saying, "Come on, come on, homie.  Let's get it on.  Do you want it?  Come on homie.  Let's go."  No one in the other group said anything except for one slightly older-looking man, who said to Tooman, "Nice day for a bike ride."  Tooman responded, "Yes, it is," and rode on.  When he was out of the men's sight, Tooman called 9-1-1.

---

[2] The amended petition charged C.L. with assault with a deadly weapon (§ 245, subd. (a)(1)), petty theft of lost property (§ 485), possession of an alcoholic beverage (Bus. & Prof. Code, § 25662, subd. (a)), trespassing (§ 602, subd. (t)), and possession of 28.5 grams or less of marijuana at school (Health & Saf. Code, § 11357, subd. (e)).

[3] C.L. does not dispute the sufficiency of the evidence to support the finding that he committed the underlying assault.

Officer Steve Philbrook responded to the 9-1-1 call, arriving on the scene at 4:15 p.m. He observed approximately 10 men fighting one another. C.L. was standing over the victim, Joseph Magdaleno, who was crouched down on his knees with his hands guarding his head. C.L. raised a baseball bat and struck Magdaleno on the back and head with it five to seven times. The blows came quickly and appeared to be made with significant force, as if C.L. were chopping wood.

As Officer Philbrook approached, the two groups ran off. C.L. and two others ran along the arroyo while Officer Philbrook followed in the patrol car. C.L. dropped the baseball bat while he was running. Officer Philbrook apprehended him. C.L. was uninjured. Meanwhile, all but two of the remaining individuals ran off into a vacant lot just north of the arroyo. Magdaleno started to walk away but was stopped by another officer who had arrived on the scene. One individual, Thomas Young, had been stabbed and was lying on the ground in a pool of blood approximately 20-30 yards from the location where C.L. had struck Magdaleno.

Detective Daniel Frates investigated the scene after the groups of young men had fled. He discovered two weapons—a large metal pipe and a screwdriver—in the wash. When Detective Frates arrived at the hospital later to interview Magdaleno, he encountered Diego Castro in the parking lot. Castro was a member of the Varrio Simi Valley (VSV) street gang. He appeared injured, with a gash and lump over his left eye. Officer Michael Foley testified that he had personally encountered Castro 15-20 times over 12 years. In approximately four of these encounters, Castro possessed a knife on his person, and one time he had ammunition in his room. Castro was involved in a fight with rival gang members at a high school a year and a half earlier.

The West Side Locos is also a criminal street gang and has a longstanding territorial feud with the VSV. The West Side Locos claims the site of the fight is in its territory.[4]

---

[4] The parties stipulated that both VSV and West Side Locos were criminal street gangs within the meaning of section 186.22.

Officer Foley, the prosecution's gang expert, testified that he had had contact with C.L. approximately 20-30 times in the last year. C.L. told Officer Foley that he has a moniker by which West Side Locos members address him.[5] Officer Foley observed photos from C.L.'s cell phone depicting C.L. throwing up gang signs. He also saw that C.L.'s school notebooks have "West Side Locos" written all over them. The moniker, the gang signs and insignia, C.L.'s gang contacts, and his arrests in this and another incident involving West Side Locos members convinced Officer Foley that C.L. is a member of the gang and not an associate.

Officer Foley was given a hypothetical situation in which members of the West Side Locos and VSV were lined up across from one another in the Arroyo wash with rocks or other weapons in their hands and, a short time later, an active participant in the West Side Locos struck a VSV member five to seven times with a baseball bat while other gang members were fighting one another. Officer Foley opined that the West Side Locos participant would have struck the VSV member for the benefit of, at the direction of, and in association with the West Side Locos. He based his opinion on his belief that gang members are required to fight alongside other gang members who are involved in a fight and because West Side Locos members would be required to fight rival gang members who enter their territory. A gang member who failed to fight on behalf of the gang would be beaten up by his own gang or made to commit some other crime to get back in the gang's good graces.

*Minor's Evidence*

C.L. testified that around noon on the day of the incident, he and two friends from West Side Locos went into the wash, where they ran into Young, and the four spent the afternoon smoking marijuana in the wash and in a nearby park. C.L. had seen Young before but had never hung out with him. Later that afternoon, C.L. observed a group of six people coming up from the park to the wash. He did not recognize any of the people, but one of his friends did.

---

[5] The record does not indicate the moniker.

C.L. had heard that Castro was a VSV gang member. He knew that Castro had been in fights with some of his friends and usually carried knives. C.L. did not know who Magdaleno was at the time of the incident.

As the group of six was approaching the wash, C.L. told his two friends to walk away because he was scared. As they began to move away, Young stood in front of them. C.L. decided to stay with Young.

The six people crossed the wash in a line. Castro was first, followed by an older Hispanic male, then Magdaleno, and lastly the three younger males. As they were crossing, they picked up rocks from the bottom of the wash.

When they arrived at the location of the incident, the older Hispanic male threw two full bottles of beer at C.L. and his friends. One bottle hit one of C.L.'s friends on the back. After the bicyclist passed by, C.L. noticed that most of the people in the larger group had weapons. In addition to the people holding rocks, the older Hispanic male had a screwdriver, Castro had a knife, and Magdaleno had a large metal pipe.

The older Hispanic male picked up C.L.'s hat off the fence where it was hanging, ripped it, threw it to the ground, and stepped on it. He also rifled through Young's backpack, removed papers, and threw both the papers and the backpack onto the rocks.

Castro punched Young. Young fell to the ground and kicked at Castro as he tried to get away. As Young tried to stand back up, Castro stabbed him in the back with a knife. The older Hispanic male tried to stab Young in the face with the screwdriver.

As Young was being stabbed, one of C.L.'s friends told him that there was a baseball bat hidden at the side of the wash. C.L. went to get the bat so that he could defend Young. After he retrieved the bat, C.L. noticed that everyone was running in different directions. Magdaleno and the older Hispanic male were running towards him. The older male veered off to the side and jumped over the fence, but Magdaleno continued straight towards C.L.

5

C.L. thought that he was about to become "another victim"—that he would be stabbed, beaten up, or otherwise hurt by the men running towards him with weapons. C.L. weighs approximately 110 pounds and is five feet, two inches tall. Joseph Magdaleno weighs approximately 210 pounds and is much taller than C.L.

When Magdaleno drew closer, C.L. swung the bat and hit Magdaleno on his shoulder. Magdaleno tried to grab the bat away from C.L. During the ensuing struggle, Magdaleno tripped and fell face down onto the ground. While Magdaleno was down, C.L. hit him twice more with the bat, striking his back. C.L. then saw a police car approaching, threw the bat away, and ran.

C.L. hangs around with West Side Locos members but only considers himself to be an associate, not a member of the gang. Most of the time West Side Locos members ask C.L. if he wants to join the gang, but he says no. According to Officer Foley, the gang expert, C.L. has never admitted to gang membership and has no tattoos, which typically would be a symbol of gang membership because gang members are often required to commit a crime to get a gang tattoo. C.L. agreed with Officer Foley that normally a gang member is required to fight a rival gang member who enters his territory, but did not think that rule applied in this instance because the VSV members were all armed and outnumbered the West Side Locos group.

DISCUSSION

*Sufficiency of the Gang Enhancement Evidence*

In reviewing claims of insufficient evidence in a juvenile delinquency proceeding, our review "'is governed by the same principles applicable to adult criminal appeals.'" (*In re A.S.* (2014) 227 Cal.App.4th 400, 590.) We examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We accept the logical inferences that the trier of fact might have drawn from the evidence

6

even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) If the trier of fact's findings are reasonably justified by the circumstances, the reviewing court's opinion that a contrary finding might also reasonably be reconciled with the circumstances does not warrant reversing the judgment. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

The criminal street gang enhancement requires proof that the minor committed the underlying felony "for the benefit of, at the direction of, or in association with any criminal street gang" (the gang-related prong) and "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (the specific intent prong). (§ 186.22, subd. (b)(1); see *People v. Rios* (2013) 222 Cal.App.4th 542, 564.) C.L. does not dispute that respondent established the gang-related prong. He challenges only the sufficiency of the evidence to support the juvenile court's finding that he had the requisite intent.

Relying principally on *In re Daniel C.* (2011) 195 Cal.App.4th 1350, C.L. contends that the trial court converted the gang enhancement into a general intent crime by expanding its application "to cover virtually *any* crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities." (*Id.* at p. 1364; see also *People v. Ramon* (2009) 175 Cal.App.4th 843, 851 [acknowledging that defendant's being "with another gang member" and "in gang territory" was not, standing alone, "adequate to establish that [defendant] committed the crime with the specific intent to promote, further, or assist criminal conduct by gang members"]; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.) He asserts that "like in *In re Daniel C.*, there is no evidence that either of [his friends from West Side Locos] committed any crime or were aware that a crime was about to occur."

This reasoning ignores several important facts in the record. First, there is ample evidence that West Side Locos members instigated the fight to protect their territory. Although C.L. claims that his group was merely responding to VSV provocations and acting in self-defense, the juvenile court need not have accepted that

7

version of events. (See *In re Cesar V.* (2011) 192 Cal.App.4th 989, 995-996.) Tooman, the bicyclist, testified that a member of C.L.'s group was antagonizing and taunting the other group to "get the fight going." He observed that the two groups "were equally armed." Moreover, the fact that a West Side Locos member hid the baseball bat near the site of the fight supports an inference that West Side Locos members planned to attack any rival gang members who entered their territory. "[U]nlawfully fight[ing] in a public place or challeng[ing] another person in a public place to fight" is a crime. (§ 415, subd. (1).)

Second, substantial evidence supports the prosecution's contention that C.L. was himself a member of West Side Locos. C.L. admitted that he hangs out with West Side Locos members and they address him using a moniker. He had photos on his cell phone in which he is shown throwing up gang signs. His school notebooks have "West Side Locos" written all over them. He was arrested in two incidents involving West Side Locos members. The gang expert's opinion that C.L. is a West Side Locos member was based on all of this evidence. The juvenile court was entitled to credit it.

Thus, even if there were no evidence of anyone in C.L.'s group fighting other than him, C.L.'s fighting as a gang member is substantial evidence of his specific intent to promote, further, or assist the gang's criminal conduct. "[T]he section 186.22(b)(1) gang enhancement may be applied to a lone actor." (*People v. Rios*, *supra*, 222 Cal.App.4th at p. 564.) Furthermore, "the criminal conduct by gang members which the defendant specifically intended to promote, further, or assist" can be "the underlying crime to which the enhancement is applied." (*In re Daniel C.*, *supra*, 195 Cal.App.4th at p. 1360.) Both C.L. and the gang expert agreed that gang members are normally required to fight when a rival gang enters their territory. As the gang expert explained, such fighting benefits one's gang because "it sends a message."

Finally, even were we to accept C.L.'s testimony that he was not a gang member, his gang member friend who directed him to the baseball bat, by aiding and abetting the assault, is deemed a principal. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 [explaining that a gang member "who aided and abetted the [crime] by

providing the [weapon], is treated under the law as a principal"]; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1129 ["[T]he act of handing a baseball bat to another person is not itself criminal. . . . However, if the person committing that act *knows* that the other person will hit a third person over the head with the bat, and *intends* to facilitate that further act, the person can be criminally liable as an aider and abettor for that further act and for any other crime actually committed that is a reasonably foreseeable consequence of the intended crime. The act of hitting someone on the head with a bat *is* inherently criminal"].) That C.L. and a gang member committed the assault in concert is sufficient to support the juvenile court's specific intent finding. (See *People v. Albillar* (2010) 51 Cal.4th 47, 68 ["[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"].) It also distinguishes this case from *Daniel C.*, *Ramon*, and *Frank S.*

### Exclusion of Graffiti Evidence

C.L. also challenges the trial court's ruling that he could not introduce evidence that Castro had written graffiti threatening to kill a West Side Locos member. He contends that this evidence was relevant to his theory of self-defense in that it showed he had a reason to fear Castro and Magdaleno.

In a proceeding to determine whether a juvenile has committed a criminal offense, "[t]he admission and exclusion of evidence" is subject to "the rules of evidence established by the Evidence Code and by judicial decision." (Welf. & Inst. Code, § 701.) "We review for abuse of discretion a trial court's rulings on the admissibility of evidence. [Citations.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 90.) Under that standard, we will not disturb the court's ruling unless the court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jones, supra,* 57 Cal.4th at p. 924.)

On cross-examination, Officer Foley was asked if he had read about an incident involving Castro and some graffiti. The prosecution objected on hearsay

9

grounds. Defense counsel asserted that "the graffiti is threatening in nature to kill another West Side Loco[s] gang member" and amounts to "specific acts of violence" that Officer Foley became aware of in preparation for the trial. Defense counsel argued that Officer Foley "can testify . . . as to Diego Castro's reputation and his opinion about Diego Castro being a violent person." In response, the prosecution acknowledged that reputation evidence might be permissible but maintained that the gang expert could not introduce hearsay evidence of specific incidents involving Castro's violent behavior. The trial court sustained the prosecution's objection, stating that it did not "see how that graffiti is an act of violence."

Any error in the exclusion of testimony about Castro and threatening graffiti was harmless. Its purpose would have been to show that C.L. had reason to be scared of Castro and, more generally, the other VSV members involved in the incident. In this respect, its probative value was low. The graffiti did not specifically threaten C.L., who claimed he was not a West Side Locos member. To the extent it purported to establish that Castro has a reputation for violence, it was cumulative with other testimony on that point. Officer Foley testified that Castro often carried a knife, at least once had ammunition in his room, and had previously fought with rival gang members at a high school.

More importantly, Castro was not directly involved in the altercation between C.L. and Magdaleno. Although C.L. claimed to have retrieved the bat to defend Young from Castro's attack, by the time he picked it up, Castro and his fellow VSV members other than Magdaleno and the older Hispanic male were already running away towards the lot north of the arroyo. The trial court rejected C.L.'s self-defense theory because C.L. used excessive force; he continued to strike Magdaleno after Magdaleno had fallen to the ground and presented "no apparent risk" to C.L. At that time, C.L. was aware that the others, including Castro and the older Hispanic male, had run off. Thus, C.L. was aware that Castro no longer presented a threat to him when he assaulted Magdaleno. Because C.L.'s fear of Castro played no role in his decision to commit the

10

crime against Magdaleno, graffiti evidence that would have explained C.L.'s fear of Castro was immaterial to the issue of self-defense and therefore harmless.

DISPOSITION

The juvenile court's judgment is affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

11

Manuel J. Covarrubias, Judge

Superior Court County of Ventura

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Stephanie C. Santoro, David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.